STATE of Minnesota, Respondent,

v.

Robert HUSS, Petitioner, Appellant.

No. C4–92–282.

Supreme Court of Minnesota.

Oct. 1, 1993.

Michael F. Cromett, Asst. State Public Defender, Saint Paul, for appellant.

Hubert H. Humphery, III, Atty. Gen., Alan Mitchell, St. Louis County Atty. and Mark S. Rubin, Asst. County Atty., Duluth, for respondent.

GARDEBRING, Justice.

This case is an appeal by appellant Robert Huss of his conviction for criminal sexual conduct in the second degree for the sexual abuse of his three-year-old daughter. The court of appeals affirmed the conviction, but modified the sentence.[1] Robert complains that the evidence was insufficient to support his conviction. We reverse.

Robert and Nancy Huss were married in March 1985. In January 1987, a daughter was born to the couple. The following spring, the couple experienced marital problems and separated. Between 1988 and 1989, the couple attempted to reconcile, but failed and again separated. In April 1990, the couple were divorced and Nancy received legal and physical custody of the child. Un-

---

1. The sentence modification is not before the    court on appeal.

der the divorce decree, Robert's visitation was to increase incrementally so that he could have overnight visitation within a year of the divorce. Nancy admitted that she did not want Robert to have unsupervised visits with the child.

Nancy testified that within a few weeks of the divorce, the child began exhibiting changed behavior that included destructive acts such as ripping up a book, as well as not picking up her toys, trying to urinate standing up like a boy and kissing on the lips. Nancy also observed that she had developed nicknames for body parts, which the child indicated she had learned from Robert.

Although she never stayed overnight with her father, the child came back wearing different clothes several times, according to her mother. Robert testified that he only changed her clothes when she got dirty, or when she came in play clothes and she changed into a dress for church. Nancy also noticed that although the visits were short (ranging from two to seven hours), over the course of a year, the child had apparently taken a shower on approximately four occasions while visiting appellant. On several occasions, after visitations, Nancy noticed that the girl's vaginal area was "bright red." She was examined by a specialist familiar with sexual abuse cases; the doctor was unable to find any evidence of penetration or abuse, but because mere touching would not leave any evidence of trauma to the genital area, he could not rule out sexual abuse. During June 1990, while the child was bathing, Nancy saw her rubbing her vaginal area with a bar of soap. Nancy asked the child if someone had done that to her before, and she said that her daddy had done it. All of these circumstances led Nancy to believe that the child was being sexually abused, and she began to expose the child to a number of books and a video about sexual abuse.

In May 1990, about a month after the divorce became final, Nancy began taking her daughter to a therapist, Marlyn Sternal, who has a master's degree in psychology. The course of therapy lasted through the time of trial, nearly a year and a half. During the period from May to October 1990, Sternal used "play therapy" with the child, which uses various toys and dolls to allow the child to communicate with the therapist. Sternal also utilized a number of books about the sexual abuse of children, including, *Sometimes It's OK to Tell Secrets* (hereinafter *"Secrets"*). *Secrets*, which is at the center of this case, comes with an audio tape that contains the words of the book set to music. The book uses the words "yucky secrets" in reference to acts of abuse.

After the child saw *Secrets* at Sternal's office, Nancy checked out the book with its accompanying tape from the public library many times throughout the summer and fall with the express intention of encouraging the child to state that Robert had abused her. The child listened to the tape often. From May through September 1990, the child made no mention of any mistreatment, either to her mother or to the therapist.

Nancy testified that on October 1, 1990, the child told her that she had a "yucky" secret, that appellant had "put his fingers in her vagina and her butt." Nancy told the child "that she was very brave, that it was a good thing for her to tell me that and I was proud of her for telling me that." Nancy admitted on the stand that she had been waiting for months for the child to say something about the abuse. Nancy then informed Sternal of the child's statement about the abuse.

On October 9, 1990, the child brought with her to a session with Sternal the *Secrets* book and tape. They listened to the tape and danced to its music. During the portion of the tape that dealt with "yucky secrets," Sternal asked the child: "Do you tell your mommy and do you tell your daddy if you have a secret or secrets?" She answered: "No, he did. He touched my private parts." When Sternal asked who did, the child replied: "My daddy did." When Sternal asked what he used, the child displayed her thumb and said "his hammer." Sternal did not report the abuse to the police at this time, but instead, out of caution, waited several weeks to do so. During this time, the child repeated the allegations.

At trial, the state's only direct evidence that the child was abused came from the

child herself. However, her testimony was far from conclusive. Additional evidence of the abuse included Nancy Huss' reports of her daughter's changed behavior and her allegations of abuse, Nancy's friends' testimony that appellant inappropriately kissed the child, and the testimony of the child's therapist.

In addition to Robert, who denied the charges, witnesses for the defense included the Huss family physician and two Ph.D clinical psychologists, one who examined Robert, Nancy and their daughter under a court order from the family court relative to the visitation dispute, and the other a child clinical psychologist who testified about the use of the book *Secrets* and its audio tape.

The family physician testified that neither he nor any of his partners ever saw any evidence of sexual abuse of the child, though they once treated her for a vaginal rash. The psychologist who performed individual court-ordered examinations on the Huss family testified that the child, who was apparently very nervous during the interview, made no allegation that Robert abused her. The second psychologist testified as to the suggestiveness of the book *Secrets* and its tape. He further testified that he would not use the book in his practice. He also said that the child's therapist's notes made him unsure as to whether the child's therapist was treating the child or investigating allegations of abuse. Finally, he believed that the therapist's notes revealed suggestive and repetitive techniques with regard to telling secrets. He based this conclusion on the frequency with which *Secrets* was used and the repeated requests of the child to hear the accompanying tape.

Robert's principal argument[2] is that, as a matter of law, the evidence was insufficient to sustain his conviction. When reviewing a claim of the sufficiency of the evidence, this court's inquiry is limited to whether, given the evidence as it was presented in court, a jury could have reasonably concluded that appellant was guilty beyond a reasonable doubt. *State v. Norgaard*, 272

Minn. 48, 52, 136 N.W.2d 628, 631–32 (1965). The reviewing court must view the evidence in a light most favorable to the verdict and assume the jury believed the state's witnesses and disbelieved the contrary evidence presented. *State v. Lanam*, 459 N.W.2d 656, 662 (Minn.1990), *cert. denied*, 498 U.S. 1033, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991). The weight and credibility of the witnesses is for the trier of fact. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). Although the standard for overturning a conviction for insufficiency of the evidence is a high one, we conclude that the state did not meet its burden of proving that Robert was guilty beyond a reasonable doubt.

The only direct evidence presented by the state was the testimony of the alleged victim, and it is that testimony which is particularly troublesome. The child was on the stand for almost an hour before she made any accusation of abuse, and then she said both her mother and her father had touched her in a bad way. When she was asked repeatedly on direct examination whether she had any "yucky secrets," she answered in the negative. Further she testified that she knew that no one was supposed to touch her private parts, but that six people had touched her there, including a playmate. She also called a hug and a touch to her hair "bad touches." Although the child had not seen her father for approximately a year before trial, she testified that she had taken a shower at his house on the day she gave her testimony. The child was not able to identify appellant in the courtroom, although he was pointed out to her and she testified that her father was bald and blind, although appellant is neither. In sum, the child's testimony was contradictory as to whether any abuse occurred at all, and was inconsistent with her prior statements and other verifiable facts. However, even given this contradictory testimony, we might not be persuaded to reverse absent the repeated use of a highly suggestive book on sexual abuse.

We believe that the use of *Secrets*, along with other similar books, is key to Robert's

---

2. Robert also argues that he was denied a fair trial as a result of several of the trial court's evidentiary rulings. We do not address these issues because of our determination on sufficiency of the evidence.

claim of insufficiency of the evidence. *Secrets* is a highly suggestive book and we are concerned that its repeated use by the child's mother and therapist, combined with the mother's belief that abuse had occurred, may have improperly influenced the child's report of events. It is undisputed that Nancy exposed her daughter to books and a video about sexual abuse before she took her to see a therapist. Further, Nancy checked out books from the library repeatedly, including *Secrets* with its accompanying tape, throughout the summer and fall of 1990, and the child listened to the *Secrets* tape many times. Nancy testified that she had waited throughout the summer and fall for her daughter to say something about the abuse. It is also undisputed that, although her exposure to this material began in April or May, the child made no mention of any sexual abuse until October after five months of therapy. The child first mentioned the abuse while she was listening to the *Secrets* tape with her mother.

■ The defense expert, a licensed consulting psychologist, testified that the book was suggestive and that he would not use it in his private practice. He believed that use of the book might cause a child to make false statements about being abused. Further, the fact that the child phrased her report of the abuse as a "yucky secret" suggests that the repetitive use of *Secrets* and its tape may have caused the child to imagine the abuse. In light of the entire record, we conclude that the evidence was insufficient to support the conviction.[3]

It is important to emphasize that the use of aids, including books, tapes, dolls and videos, is permissible when trying to ascertain whether a child has been sexually abused. However, in this case, the repetitious use of *Secrets*, and its tape, raise questions about the validity of the accusations made against Robert. This is especially so in light of the child's testimony. We conclude, on these unusual facts, that the state did not meet its

burden of proof beyond a reasonable doubt and that the conviction should be reversed.

Reversed.

---

3. We also note that the allegations of abuse took place in the context of a visitation dispute. Nancy testified that she did not want Robert to be allowed to visit the child before any allegations of abuse were made. We do not mean to suggest that allegations of child sexual abuse are to be discounted when they occur in the context of a

custody or visitation dispute. Such claims must always be fully evaluated and investigated if children are to be protected. However, we believe that the existence of the visitation dispute is relevant to our overall view of the evidence in this case.