*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2039**

State of Minnesota,
Respondent,

vs.

Kalen Duane Johnson,
Appellant.

**Filed November 3, 2014
Affirmed
Larkin, Judge**

Mille Lacs County District Court
File No. 48-CR-13-364

Lori Swanson, Attorney General, Michael Everson, Assistant Attorney General, St. Paul, Minnesota; and

Janice S. Jude, Mille Lacs County Attorney, Milaca, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Schellhas, Judge; and Bjorkman, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges the sufficiency of the evidence to support his conviction for second-degree assault and the district court's ruling that the state could impeach him with his prior felony convictions if he testified. We affirm.

## FACTS

On February 22, 2013, Mille Lacs Tribal Police Officer Derrick Naumann responded to a residence in Onamia, Minnesota, where appellant Kalen Johnson had reportedly stabbed J.M.N. and left on foot. While driving to the residence, Officer Naumann saw a man walking near the residence. When Officer Naumann arrived at the residence, he observed what appeared to be blood outside of the front door and inside of the entrance. J.M.N. was sitting in the living room, bleeding from a puncture wound to his leg. He told Officer Naumann that he and Johnson, who is his cousin, were drinking and arguing and that Johnson stabbed him three times in the leg. Officer Naumann observed three puncture wounds on J.M.N.'s left leg.

After an ambulance took J.M.N. to a hospital, Officer Naumann retrieved Johnson's driver's license photo. The photo matched the appearance of the man he had previously seen walking near the residence. Later, Officer Naumann saw Johnson walking south on a highway and arrested him. He found a paring knife and scissors in Johnson's pockets and saw what appeared to be blood on Johnson's jacket sleeve, pants, and bandana. He read Johnson a *Miranda* warning, and Johnson agreed to give a statement. Johnson told Officer Naumann that he had been drinking beer on the shore of

Mille Lacs Lake, that the officer would find his beer cans on the shore, and that he had no knowledge of the stabbing. Officer Naumann checked the shoreline and found no beer cans or tracks in the nearby snow.

The state charged Johnson with second-degree assault, third-degree assault, and felony domestic assault. The state moved to impeach Johnson with the following convictions if he testified at his trial: fleeing a police officer in a motor vehicle (2004), first-degree criminal damage to property (2005), motor-vehicle theft (2005), possession of a firearm by an ineligible person (2006), and motor-vehicle theft (2011). The district court granted the motion.

At Johnson's trial, the state called nine witnesses, including J.M.N. and Officer Naumann. J.M.N. testified that Johnson had invited him to his aunt's house to drink. Once they were intoxicated, Johnson brought up his brother's recent death. J.M.N. said he got upset and told Johnson that he did not want to talk about Johnson's brother. This led to an argument, and J.M.N. told Johnson that he was going to leave. J.M.N. testified, "[A]fter I said that, [Johnson] got up and told me not to leave and that I was gonna disown 'em like the rest 'a the family did." J.M.N. said that Johnson followed him to the door and stabbed him three times with a pocket knife.

Officer Naumann testified that he observed three puncture wounds on J.M.N.'s leg and that J.M.N. said that his cousin had stabbed him with a folding knife. Officer Naumann stated that J.M.N.'s aunt was the only other person in the residence and that she was "heavily intoxicated" and told him that she "didn't see anything." Officer Naumann testified that he observed Johnson walking along a highway approximately 30 minutes

3

after he arrived at the residence. He stated that he did not find a folding knife on Johnson but that Johnson had knee-high snow on his pants and was near a wooded area with up to ten inches of snow on the ground.

After the state rested its case, Johnson chose not to testify. He acknowledged that if he did testify, the state would be allowed to impeach him with his prior convictions. Johnson did not call any witnesses. The jury found him guilty of all three counts. The district court convicted him of second-degree assault and sentenced him to serve 51 months in prison.

Johnson appeals, challenging the sufficiency of the evidence to support his conviction and the district court's pretrial ruling that the state could impeach him with his prior convictions if he testified at trial.

## D E C I S I O N

## I.

When presented with a claim of insufficient evidence, this court's review is limited to a careful analysis of the record to determine whether the evidence presented at trial, viewed in a light most favorable to the conviction, is sufficient to allow the jury to reach the verdict that it did. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004). This court will not disturb the verdict if the jury, "acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [the appellant] was proven guilty of the offense charged." *Id.*

Second-degree assault occurs when a person "assaults another with a dangerous weapon." Minn. Stat. § 609.222, subd. 1 (2012). Johnson contends that the state failed to prove that he was the one who assaulted J.M.N. His argument focuses on J.M.N.'s credibility as a witness. He argues that "where [J.M.N.'s] credibility was significantly undermined by inconsistent testimony, the state failed to prove the assault charges beyond a reasonable doubt." He asserts that "grave doubts about exactly what happened exist and the evidence at trial did not establish beyond a reasonable doubt that [he] assaulted [J.M.N.]"

"[A] conviction can rest on the uncorroborated testimony of a single credible witness." *State v. Foreman*, 680 N.W.2d 536, 539 (Minn. 2004) (quotation omitted). The determination of whether a witness was reliable is a matter for the jury, not the reviewing court. *See State v. White*, 357 N.W.2d 388, 390 (Minn. App. 1984) ("[T]he factfinder must choose between conflicting factual accounts and determine the credibility, reliability, and weight given to witnesses' testimony."). Accordingly, we defer to the jury's credibility determinations, *State v. Watkins*, 650 N.W.2d 738, 741 (Minn. App. 2002), and assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989).

Johnson acknowledges the deference owed to the jury's credibility determinations, but he relies on *Foreman* to argue that "in cases where 'additional reasons to question the victim's credibility' exist and the State presented no corroborating evidence, Minnesota's appellate courts will reverse convictions." In *Foreman*, however, the supreme court

affirmed the defendant's conviction, concluding that "there were no other reasons to question [the victim's] credibility and her testimony at trial was not contradicted." *Foreman*, 680 N.W.2d at 539. The supreme court distinguished three cases in which convictions were reversed "because each involved additional reasons to question the victim's credibility." *Id.* Johnson relies on those cases, but all three cases are distinguishable from this case.

The first case, *State v. Huss*, involved the testimony of a three-year-old alleged victim who provided the state's only direct evidence. 506 N.W.2d 290, 292 (Minn. 1993). The supreme court summarized the child's testimony as "contradictory as to whether any abuse occurred at all, and . . . inconsistent with her prior statements and other verifiable facts." *Id.* The court also stated that the "repetitious use" of a therapy book and its audio tape "may have caused the child to imagine the abuse," a theory supported by a licensed psychologist who testified as a defense expert at the trial. *Id.* at 293. The court concluded that, "on these unusual facts, . . . the state did not meet its burden of proof beyond a reasonable doubt and that the conviction should be reversed." *Id.*

In the second case, *State v. Langteau*, only the defendant and the alleged victim "gave significant evidence at the trial." 268 N.W.2d 76, 77 (Minn. 1978). The supreme court noted that the victim's actions were "unexplained," the reasons why the defendant would have committed the crime were "left a mystery," and "nothing was discovered to link [the defendant] with the crime." *Id.* The court held that under these circumstances, the interests of justice required a new trial. *Id.*

6

Lastly, *State v. Gluff* involved the trustworthiness of a witness's lineup identification of the defendant. 285 Minn. 148, 151, 172 N.W.2d 63, 65 (1969). The supreme court noted that the witness saw the perpetrator for only 30 seconds before "he leveled a revolver at her" and that her description to police was "wholly at variance" with her later identification. *Id.* The court stated that the witness's testimony about her identification "clearly lacked probative value" because of flaws with the lineup procedure. *Id.* And it concluded that because the identification was not corroborated and the victim had a "limited opportunity to observe the robber," a critical issue in the case was "permeated with doubt." *Id.* The court held that a new trial in the interest of justice was required. *Id.* at 153, 172 N.W.2d at 66.

None of these cases is factually similar to this case. J.M.N., the 28-year-old victim, consistently testified during three rounds of direct and cross-examination that Johnson stabbed him. He did not have to identify Johnson from a lineup; Johnson is his cousin and they had spent hours together before the stabbing. Police-officer testimony regarding what J.M.N. reported immediately after the stabbing was generally consistent with J.M.N.'s trial testimony. Moreover, the officers observed blood at the residence and J.M.N.'s puncture wounds. Officer Naumann saw Johnson near the residence when he was responding to J.M.N.'s 911 call, and Johnson's explanation regarding where he had been was not confirmed. In sum, J.M.N. was not the state's sole witness, his story was largely corroborated, and his testimony had significant probative value.

Nonetheless, Johnson states that "there were significant reasons for the jury and this Court to doubt [J.M.N.'s] credibility," specifically:

- J.M.N. "had been drinking for several hours and was very intoxicated."

- J.M.N.'s testimony was impeached with "several inconsistencies from what he had told police."

- J.M.N.'s aunt told police she did not see anything despite being in the vicinity of the alleged incident.

- The BCA did not find J.M.N.'s blood on Johnson's pants or coat.

- Police did not find blood in a snowbank, into which J.M.N. claimed he fell after being stabbed.

- Police did not recover a weapon from Johnson "that was consistent with the one [J.M.N.] claimed."

- J.M.N.'s explanation of why Johnson stabbed him "is difficult to understand," and "it is not clear why [J.M.N.'s] actions would have caused [Johnson], his cousin, to rashly stab him."

But Johnson's attorney cross-examined the state's witnesses about all of these issues and discussed them in his closing argument. The attorney cross-examined J.M.N. about his intoxication, his statement to police, and the events surrounding the stabbing. He cross-examined a BCA employee about whether J.M.N.'s blood was found on Johnson's clothes, a police officer about whether there was blood outside the residence, another police officer about the blood on Johnson's clothes, and yet another officer about blood around the residence and the knife found on Johnson. And the attorney highlighted all of those issues in his closing argument. The jury's verdict reflects its rejection of those arguments in favor of the state's witnesses and evidence. Because the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that Johnson was proved guilty of second-degree assault, we do not disturb the verdict.

**II.**

Johnson also argues that the district court erred by ruling that the state could impeach him with five prior felony convictions if he testified. We review the district court's decision for an abuse of discretion. *State v. Williams*, 771 N.W.2d 514, 518 (Minn. 2009). A witness may be impeached with evidence of his prior convictions if the crime "involved dishonesty or false statement," or if it was a felony and the evidence's probative value outweighs its prejudicial effect. Minn. R. Evid. 609(a). When balancing the probative value and prejudicial effect, courts consider five factors:

> (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

*State v. Jones*, 271 N.W.2d 534, 538 (Minn. 1978). "[A] district court should demonstrate on the record that it has considered and weighed the *Jones* factors." *State v. Swanson*, 707 N.W.2d 645, 655 (Minn. 2006). The district court here addressed each of the *Jones* factors on the record, and we review the district court's analysis of each factor in turn.[1]

---

[1] The district court determined that Johnson's two prior convictions of motor-vehicle theft were crimes that involved dishonesty. Johnson assigns error to that determination. Because the district court nonetheless analyzed those convictions using the *Jones* factors, we do not review the district court's determination that motor-vehicle theft is a crime involving dishonesty for purposes of Rule 609.

9

*Impeachment Value of the Prior Crimes*

The district court reasoned that the impeachment value of Johnson's prior convictions is "important" and that the evidence would give the jury "context to assess Mr. Johnson's general trustworthiness." The court stated, "Each of [Johnson's convictions] I think help the jury to see the defendant as a whole person, and . . . I think helps them to assess his credibility which is a central issue here." This analysis aligns with our caselaw, which permits evidence of prior convictions even if they do not directly relate to the defendant's veracity. *See State v. Gassler*, 505 N.W.2d 62, 67 (Minn. 1993) ("[T]he fact that a prior conviction did not directly involve truth or falsity does not mean it has no impeachment value."); *see also Swanson*, 707 N.W.2d at 655 (affirming a district court's decision to permit impeachment with evidence of defendant's prior conviction for motor-vehicle theft, among others). Evidence of a prior conviction has impeachment value because it helps the jury "see the whole person of the defendant and better evaluate his or her truthfulness." *Swanson*, 707 N.W.2d at 655 (quotation omitted).

Johnson argues that "the whole-person rationale did not support admitting evidence of [his] prior felony convictions because, even if the jury needed to see 'the whole person,' admission of [his] drinking and other evasive conduct (denying knowing J.M.N.) should have sufficed." He states, "Evidence of these actions [was] enough to provide the jury with a picture of what kind of person [he] is. The jury did not need the evidence to see 'the whole person,' and the five prior convictions had no other impeachment value." Johnson provides no support for his contention that evidence of behavior related to the underlying offense diminishes the impeachment value of a prior

10

conviction. The district court determined that the impeachment evidence would assist the jury's credibility determination, and given our supreme court's adherence to the "whole person" approach, that decision was not an abuse of discretion. *See State v. Zornes*, 831 N.W.2d 609, 627 (Minn. 2013) (continuing to apply the whole person approach).

*Date of the Convictions and the Defendant's Subsequent History*

Johnson argues that the age of his prior convictions "should have weighed against admissibility, at least for the older offenses." The charged offense occurred in February 2013; Johnson's prior convictions are from 2004, 2005, 2006, and 2011. The district court acknowledged that Johnson's 2004 conviction for fleeing from a police officer "is close to the end of the ten-year period." *See* Minn. R. Evid. 609(b) ("Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date . . . ."). But the district court reasoned that the conviction is "not stale due to the subsequent history that Mr. Johnson has." The district court's reasoning is sound because "even an older conviction can remain probative if later convictions demonstrate a history of lawlessness." *Swanson*, 707 N.W.2d at 655 (quotation omitted); *see also State v. Ihnot*, 575 N.W.2d 581, 586 (Minn. 1998) (eight-year-old conviction had not lost any relevance because two subsequent convictions showed a "pattern of lawlessness").

*Similarity of the Past Crimes to the Charged Crime*

Johnson further argues that his convictions for possession of a firearm by an ineligible person and criminal damage to property "connote some level of potential

physical violence similar to assault." But he also acknowledges that the risk of prejudice "was less [here] because the prior charges were not similar to the assault charge." "The more similar the alleged offense and the crime underlying a past conviction, the more likely it is that the conviction is more prejudicial than probative." *Swanson*, 707 N.W.2d at 655. The similarity of Johnson's prior convictions to his alleged assault is minimal.

*Importance of the Defendant's Testimony and the Centrality of the Credibility Issue*

The district court stated that the fourth *Jones* factor weighs in favor of excluding the evidence because "it has a prejudicial [e]ffect in that it may keep Mr. Johnson in fact from testifying." But it found that the potential prejudice was "outweighed by the probative value, especially in light of factor Number 5 where . . . credibility is, . . . central in this case." It further stated, "when the jury has to choose between believing the victim and the defendant, then the need for such evidence is greater. And this . . ., is exactly that situation."

"If credibility is a central issue in the case, the fourth and fifth *Jones* factors weigh in favor of admission of the prior convictions." *Id.* Credibility was a central issue at Johnson's trial. Because J.M.N.'s aunt said she did not observe the incident, Johnson and J.M.N. were the only witnesses who could provide direct evidence regarding the offense. Their credibility therefore was important to the jury's determination. Johnson's lawyer demonstrated that importance by focusing a significant portion of his closing argument on the veracity of J.M.N.'s testimony.

Johnson admits that his testimony "could certainly have been important because the case was to some degree a credibility contest about J.M.N.'s observations" and that this weighs in favor of including evidence of his prior convictions. But he argues that only "some" of the evidence should have been admitted because "the State already had the evidence of [his] drinking and evasiveness and the admission of all five convictions simply would have been overkill." He does not cite a case that sets a limit on the number of prior convictions that may be used for impeachment. Ultimately, the decision was entrusted to the district court's sound discretion. The district court thoroughly analyzed the *Jones* factors, and the majority of the factors favored admission. We discern no abuse of discretion in the district court's ruling that the state could impeach Johnson with his five prior felony convictions.

**III.**

Johnson raises additional issues in his pro se supplemental brief. He questions whether the 911 call actually came from J.M.N.'s aunt's phone number and why there was no discussion at his evidentiary hearing about the state "admitting a big drawing board to prove [his] guilt." But Johnson does not explain why those concerns show reversible error. *See* Minn. R. Crim. P. 31.01 ("Any error that does not affect substantial rights must be disregarded."). Although Johnson lists the statutes and cases that he "looked up," he provides no legal arguments based on those authorities.

Beyond those issues, Johnson's pro se brief presents a sufficiency-of-the-evidence argument that duplicates his attorney's argument. We have already addressed the

13

sufficiency of the evidence to sustain Johnson's conviction in section I, and we do not repeat our analysis here.

**Affirmed.**