*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0706**

State of Minnesota,
Respondent,

vs.

Troy Adam Gocha,
Appellant.

**Filed February 29, 2016
Affirmed
Chutich, Judge**

Swift County District Court
File No. 76-CR-14-16

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Danielle Olson, Swift County Attorney, Harry D. Hohman, Assistant County Attorney, Benson, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Bjorkman, Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

Appellant Troy Gocha appeals from two convictions of second-degree assault. *See*

Minn. Stat. § 609.222, subd. 1–2 (2014) (assault with a dangerous weapon and assault with

a dangerous weapon and infliction of substantial bodily harm, respectively). He argues that the state did not prove an assault with a dangerous weapon. Because we conclude that the evidence was sufficient to support the jury verdict, we affirm Gocha's convictions.

**FACTS**

In January 2014, T.L. was assaulted by two men, whom he identified as R.A. and appellant, Troy Gocha. According to T.L.'s testimony at trial, the facts underlying the assault are as follows. T.L., R.A., and Gocha knew each other through work and through selling methamphetamine together with another mutual friend, K.W. At the time of the assault, T.L. had been hiding out at K.W.'s house to avoid a warrant for his arrest. On the day of the assault, K.W. drove T.L. to the local jail to turn himself in on the warrant. On the way to the jail, T.L. looked in K.W.'s purse and found a methamphetamine container. T.L. took the container and told K.W., "I'm bringing [you] down and [Gocha] down with you." K.W. got angry and turned the car around to drive back to her house, where she called Gocha and R.A. As T.L. left K.W.'s house, R.A. came "whipping down the alleyway," got out of his car, and punched T.L. in the face twice. T.L. testified that he started walking away from R.A., but then Gocha joined them, called T.L. a name, and taunted him about walking away from the fight with R.A. T.L. explained that because Gocha assured him that he would not join in if T.L. fought R.A., T.L. decided to do so.

T.L. stated that Gocha had a gun in a brown holster on his body; T.L. described the gun as having a wooden handle and a chrome or stainless steel body. According to T.L., Gocha said, "I hope to God I won't have to use this on you," referring to the gun. T.L. testified that R.A. then swung a club at him and missed. T.L. then tackled R.A. and fought

2

him for the club. T.L. testified that Gocha intervened when T.L. was "getting the better of R.A." and hit T.L. on the head with the gun, causing T.L. to fall on some brick lawn edging. T.L. claimed that Gocha said "I f-cking lied to you" and began stomping on his head against the bricks, while R.A. hit him with the club. T.L. eventually shoved his assailants off and got away.

T.L.'s trial testimony regarding the assault varied slightly from the statements he made to police soon after the attack. He testified that R.A. hit him with a club or a golf club but told police that R.A. used a "black pipe or black baton." T.L. also initially told the police that R.A. was driving a white Dodge Neon but testified that it was a white Chevy Cobalt. Further, at trial, T.L. testified that he saw Gocha hit him with the gun, even though, within five hours of the assault, he told police that he "didn't see Troy Gocha hit [him] with a gun." On redirect, however, T.L. clarified that, although he did not directly see Gocha hit him, he saw Gocha pull the gun out and then felt the impact on his head. T.L. also testified that he would be embarrassed or concerned if someone thought he was a coward.

After the assault, T.L.'s sister brought him to the police station, where he turned himself in on a warrant. Noticing his injuries, a police officer called an ambulance. According to the doctor who treated T.L., his most significant injury was a three-inch laceration of his scalp that went "almost all the way down to the skull bone" and required 13 to 15 sutures. T.L. also suffered a mild concussion and a contusion to his left ribs and abdomen. The doctor testified that T.L. told him that "he thought he was pistol-whipped for the injury on his scalp, and he wasn't quite sure how he got the injury on the abdomen."

3

The doctor further testified that the injury was caused by a substantial object, stating that a pistol could have caused the deep laceration.

When the police went to the scene to investigate, they found a silver and black golf club, which they photographed but did not take into evidence because they did not think it looked like it had been used in the assault. The police officers also photographed what appeared to be blood found in K.W.'s driveway, the snow next to K.W.'s driveway, and on the road, but they did not perform any tests on the blood. The officers did not find any additional weapons, and they did not talk to K.W., who likely saw the assault from her car.

Gocha called two witnesses in his defense. The first, M.B., met R.A. in jail. He testified that he overheard R.A. saying that he "beat up" T.L. without a weapon and that Gocha was not even there. On cross examination, M.B. testified that R.A. later changed his story and said that Gocha was there but maintained that no weapons were involved.

The second witness, J.R., met T.L. in jail. J.R. testified that when J.R. asked him about the scar on his head, T.L. said that he got it in a fight with R.A. and "another guy." J.R. further testified:

> [T.L.] told the police that it happened from a weapon, but he told me that he lied and said there was no weapon, he just didn't want to look like a p-ssy, he said. I mean that's his exact words, he didn't want to look like a p-ssy.

J.R. also testified that Gocha was not his friend, J.R. had never seen Gocha before, and had no reason to lie for him. On rebuttal, the state recalled T.L., who denied lying about the weapon and testified that he told J.R. that Gocha had hit him with a gun.

4

The jury convicted Gocha of both charges. By a special-verdict question used for sentencing-enhancement purposes, the jury was asked: "If you find the Defendant used 'a dangerous weapon', was the weapon a firearm?" The jury answered "yes." The district court imposed a 36-month sentence. Gocha appeals.

## D E C I S I O N

Gocha argues that the evidence is legally insufficient to support his conviction. He contends that the state failed to prove beyond a reasonable doubt that he assaulted T.L. with a firearm because T.L.'s testimony about the firearm conflicted with his initial statement to police, the police did not recover a firearm or link one to him, T.L. admitted that he did not want to appear weak, and T.L.'s treating physician testified that his injury could have been caused by a substantial object other than a firearm. Gocha further maintains that, even though the state did not need to prove he used a firearm, because the state's "arguments and evidence at trial were limited to attempting to prove that [he] struck [T.L.] with a firearm," the state did not prove that he used any other object. Gocha's arguments are unpersuasive.

"When reviewing the sufficiency of the evidence leading to a conviction, we view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict." *State v. Hayes*, 831 N.W.2d 546, 552 (Minn. 2013) (quotation omitted). This court determines whether legitimate inferences drawn from the record evidence would allow a factfinder to conclude that the defendant was guilty beyond a reasonable doubt. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012).

We assume "that the jury believed all of the state's witnesses and disbelieved any evidence to the contrary." *State v. Chambers*, 589 N.W.2d 466, 477 (Minn. 1999).

This court "will not disturb the verdict if the jury, acting with due regard for the presumption of innocence" and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offenses. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn. 2004) (quotations omitted). Reversal is appropriate, however, "if facts proving an essential element of the offense are left more to conjecture and speculation than to reasonable inference." *State v. DeRosier*, 695 N.W.2d 97, 108 (Minn. 2005).

"[A] conviction can rest on the uncorroborated testimony of a single credible witness." *State v. Foreman*, 680 N.W.2d 536, 539 (Minn. 2004) (quotation omitted). But, as Gocha argues, "convictions have been reversed where the evidence supporting the conviction was of dubious credibility." For that proposition, he cites two cases from the Minnesota Supreme Court: *State v. Huss*, 506 N.W.2d 290, 292–93 (Minn. 1993), and *State v. Langteau*, 268 N.W.2d 76, 77 (Minn. 1978). These cases represent a narrow exception not only to the caselaw stating that uncorroborated testimony of a single witness can uphold a conviction but also to the general rule that appellate courts defer to juries on credibility matters. *See State v. Engholm*, 290 N.W.2d 780, 784 (Minn. 1980) ("[I]t is well-settled in Minnesota that it is the province of the jury to determine the credibility and weight to be given to the testimony of any individual witness."); *see also State v. Miles*, 585 N.W.2d 368, 373 (Minn. 1998) (noting that "the jury determines the weight and credibility of individual witnesses and . . . a conviction may rest on the testimony of a single credible

witness"); *State v. Burch*, 284 Minn. 300, 313, 170 N.W.2d 543, 552 (Minn. 1963) (noting that the supreme court has stated that "a verdict may be based on the testimony of a single witness no matter what the issue"). We conclude that the facts of those cases are readily distinguishable.

First, the state offered strong evidence of an assault with a dangerous weapon that corroborated T.L.'s testimony: evidence of T.L.'s deep wound, the doctor's testimony that the wound had to have been caused by a substantial object and could have been caused by a firearm, and the photographs of blood at the scene of the attack.

Secondly, *Langteau* and *Huss* both included additional facts that cast doubt on the victim's testimony. In *Langteau*, the supreme court concluded that the uncorroborated testimony of the victim in that case was insufficient to uphold the defendant's conviction under the unique circumstances of that case. 268 N.W.2d at 77. These circumstances included:

> defendant's alleged unexplained robbery of a victim with whom defendant was well acquainted, defendant's denial of any involvement, [the] failure to discover any evidence linking defendant with robbery, [the] jury's original reporting of no possibility of agreement and [the] jury's return of [a] guilty verdict almost ten hours after commencement of deliberations and after receipt of instructions on [the] meaning of "reasonable doubt."

*Id*. at 76. In *Huss*, the supreme court reversed a conviction for criminal sexual conduct in which the only direct evidence was the testimony of the three-year-old victim. 506 N.W.2d at 290, 292. The supreme court explained:

> In sum, the child's testimony was contradictory as to whether any abuse occurred at all, and was inconsistent with her prior

7

> statements and other verifiable facts. However, even given this contradictory testimony, we might not be persuaded to reverse absent the repeated use of a highly suggestive book on sexual abuse.

*Id.* at 292. The supreme court's decision did not rely solely on concern that the witness's testimony was unreliable and inconsistent; instead, the case turned on an additional concern over the effect of a therapist's suggestive and repetitive techniques on a very young child. *Id.*

By contrast, nothing in the record here persuades us to depart from the general rule of deferring to the credibility determinations of the jury. Unlike the child victim in *Huss*, T.L.'s testimony was consistent at trial and reconcilable with prior statements to police. And, unlike the victim in *Langteau*, T.L.'s version of events made sense and did not leave unexplained narrative holes. Because we conclude that T.L.'s testimony and the corroborating physical evidence are sufficient to support the jury verdict, we affirm Gocha's convictions.

**Affirmed.**