*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0416**

State of Minnesota,
Respondent,

vs.

Omar Abubakar Maani,
Appellant.

**Filed March 11, 2024
Affirmed
Ede, Judge**

Olmsted County District Court
File No. 55-CR-21-3851

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mark A. Ostrem, Olmsted County Attorney, James E. Haase, Senior Assistant County Attorney, Rochester, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Paul J. Maravigli, Special Assistant Public Defender, Minneapolis, Minnesota (for appellant)

Considered and decided by Ede, Presiding Judge; Worke, Judge; and Bjorkman, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

In this direct appeal from final judgments of conviction for three counts of second-degree assault with a dangerous weapon, appellant argues that there was insufficient

evidence to prove the dangerous-weapon element of each charge and that there was insufficient evidence to prove that he assaulted one of the three victims. Because we conclude that, viewing the evidence in the light most favorable to the verdicts, the direct evidence was sufficient to permit the jury to have reasonably concluded that appellant was guilty of the offenses of which he was convicted, we affirm.

**FACTS**

Respondent State of Minnesota charged appellant Omar Abubakar Maani with three counts of second-degree assault with a dangerous weapon, in violation of Minnesota Statutes section 609.222, subdivision 1 (2020). The charges arose from a July 2021 stabbing incident at Maani's apartment complex in Rochester. The matter proceeded to a jury trial in September 2022.

Before the close of evidence, the state amended count III and added count IV, another charge of second-degree assault, in violation of Minnesota Statutes section 609.222, subdivision 1. After these amendments, count I and count II were premised, respectively, upon Maani's intentional infliction of bodily harm against victim 1 and victim 2; count III was premised upon Maani's attempt to inflict bodily harm upon victim 3; and count IV was premised upon Maani's commission of an act with intent to cause fear of immediate bodily harm in victim 3. *See* Minn. Stat. § 609.02, subd. 10 (2020) (defining "assault" as "an act done with intent to cause fear in another of immediate bodily harm or death" or "the intentional infliction of or attempt to inflict bodily harm upon another").

Except where otherwise noted, the following recitation of facts is based on direct evidence adduced at trial and stated in the light most favorable to the jury's verdicts. The jury heard testimony from: the three victims; victim 2's sister, A.M.; an eyewitness and resident of the apartment complex, A.B.; the responding police officers and investigator; and Maani himself.

Victims 1, 2, and 3 met up with Maani at his apartment. Victim 2's sister, A.M., arrived a short time later. All four women drank alcohol with Maani. At some point, Maani went into his bedroom and fell asleep, leaving the four women in the living room. After about an hour, the three victims entered Maani's bedroom, and victim 3 tried to persuade Maani to rejoin them in the living room. Maani returned to the living room after he noticed that some of his personal items were missing from his bedside.

Maani blocked the door to the apartment and told the four women that they could not leave until they returned his missing items, prompting a verbal and physical altercation between Maani and victim 3. Maani threw victim 3 to the ground, causing her lower back to strike a metal stool. A.M. and victims 1 and 2 began to physically fight with Maani. Eventually, the women managed to open the door to the apartment and exit into the hallway. Maani chased the women, striking and slashing them with a "machete" that he removed from a black case. The weapon was a large knife between one foot and two feet long. Maani ran towards the four women with the weapon in his hand and began cutting them by waving the weapon around, swinging it like "he was trying to hurt" the women, "throwing [the weapon] back and forth, . . . and just slicing" them.

While waving and swinging the weapon, Maani sliced victim 1 on her left thigh, used "full arm force" to slash victim 2 on her right arm, and cut victim 3's lower back.[1] Victim 3 felt scared that she was going to die. Victim 1 ran to the aid of victim 2, and Maani continued to approach and to swing the weapon. Both cuts Maani inflicted upon victim 1 and victim 2 were deep and exposed subcutaneous tissue. Victims 1 and 2 used pieces of victim 3's shirt as makeshift tourniquets to stop their bleeding. Maani also hit A.M. with the weapon, but the blow did not break A.M.'s skin.

A.B., the eyewitness, was preparing for bed when she heard a "commotion" in the hallway. A.B. opened the door to her apartment and watched as Maani entered the hallway swinging what she believed to be a belt in the direction of a group of three or four women. A.B. eventually identified the object in Maani's hand as a "machete." As A.B. watched Maani walk back down the hallway away from the women, the women began hitting and swinging at him, and someone yelled, "He just cut me with the effing machete." A.B. saw "a lot of blood" and "could smell the blood." A.B. called the police. Maani fled downstairs and out of the building. Police responded to the apartment.

Officers had to help victim 1 down the stairs to exit the apartment building. Victims 1 and 2 were both taken to a hospital by ambulance. Victim 1 received stitches and

---

[1] Victim 3 testified that Maani cut her on her lower back as she and the other women ran through the hallway. But one of the responding officers testified that victim 3 told him both that Maani kicked her in the back while they were fighting inside his apartment unit and that she was unsure "if she was kicked or struck with something." Similarly, rather than describing an injury to victim 3 based on Maani cutting victim 3 in the hallway, A.M. stated that Maani threw victim 3 against a metal stool while they struggled inside Maani's apartment. And victim 1 said that Maani injured victim 1 and victim 2 in the hallway, and that she did not see Maani swing the knife at anyone else.

was "on crutches for a while" after the incident. Victim 2 underwent surgery on her arm and later experienced scarring where Maani cut her. Victim 2's arm no longer functions "the way it used to."

The district court admitted into evidence photographs taken at the scene. The photographs included pictures of a "kitchen knife"—which did not appear to have blood on it—and a black machete sheath found inside the apartment. The photos show blood smeared and splattered on the walls and carpet of the hallway leading to Maani's apartment. The district court also received into evidence photographs taken at the hospital of injuries to victim 1 and victim 2. The state did not offer the weapon used in the assaults into evidence.

Maani testified that the four women became violent when he confronted them about his missing items. He stated that, while the four women fought with him in his apartment, victim 3 came at him with a butcher knife. Maani stated that the women chased him down the hallway and attacked him. According to Maani, he did not have a machete and he did not cut anyone that night. Although Maani acknowledged that he owned the sheath, he explained that it was part of a costume and the sheath did not have a blade.

Following deliberations, the jury returned guilty verdicts on all four counts of second-degree assault. The district court entered convictions on counts I, II, and III and imposed three consecutive sentences of 21 months in prison.[2] Maani appeals.

---

[2] The district court did not enter a conviction on count IV because it was based on the same behavioral incident that undergirded count III.

**DECISION**

Maani contends that the trial evidence is insufficient to support the guilty verdicts. In particular, Maani argues that the state failed to prove that he assaulted any of the victims with a dangerous weapon because there was contradictory testimony about the incident and the state failed to produce the alleged weapon. Maani also asserts that the state failed to prove he assaulted victim 3—as charged in counts III and IV—because he maintains that victim 3 testified falsely and other evidence contradicted her testimony. The state counters that the record evidence is sufficient, both to prove that Maani assaulted all three victims with a dangerous weapon and to support the jury's verdicts as to counts III and IV. We agree with the state.

"Direct evidence is evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *State v. Loveless*, 987 N.W.2d 224, 247 (Minn. 2023) (quotation omitted). "When reviewing the sufficiency of direct evidence, we painstakingly review the record to determine whether that evidence, viewed in the light most favorable to the verdict, was sufficient to permit the jurors to reach the verdict that they did." *State v. Segura*, ___ N.W.3d ___, ___, 2024 WL 358029, at *6 (Minn. Jan. 31, 2024) (quotation omitted). "An appellate court will not disturb a guilty verdict if the fact-finder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could have reasonably concluded that the state proved the defendant's guilt." *State v. Olson*, 982 N.W.2d 491, 495–96 (Minn. App. 2022) (citing *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn. 2004)). As a reviewing court, we "assume that the jury believed the state's witnesses and disbelieved any evidence

6

to the contrary." *Loveless*, 987 N.W.2d at 246 (quotation omitted). Rather than "reweigh the evidence presented to the district court[,]" appellate courts "defer to the credibility determinations made by the factfinder." *State v. King*, 990 N.W.2d 406, 421 (Minn. 2023); *see also Olson*, 982 N.W.2d at 495 ("The appellate court defers to the fact-finder's credibility determinations and will not reweigh the evidence on appeal.").

Pointing to purportedly false and contradictory testimony, Maani asks that we forego application of the preceding well-established legal principles that customarily govern our review. Maani relies on three cases—*State v. Huss*, 506 N.W.2d 290 (Minn. 1993); *State v. Langteau*, 268 N.W.2d 76 (Minn. 1978); and *State v. Gluff*, 172 N.W.2d 63 (Minn. 1969)—to argue that the evidence is insufficient as a matter of law because of issues regarding the victims' credibility.

But, in resolving sufficiency challenges like that presented in Maani's appeal, both the Minnesota Supreme Court and this court have distinguished and limited *Huss*, *Langteau*, and *Gluff* to the unique facts of those cases. *See State v. Foreman*, 680 N.W.2d 536, 537–39 (Minn. 2004) (holding that the victim's testimony provided sufficient evidence to support a second-degree assault conviction, despite the victim's prior recantation of assault allegations against the defendant); *State v. Balsley*, 999 N.W.2d 880, 886–88 (Minn. App. 2023) (concluding that there was sufficient evidence to support second-degree criminal-sexual-conduct convictions, and that there were not "unusual circumstances that would justify a determination that [the teenage victim's] testimony was not reliable," despite "alleged inconsistencies" in the victim's testimony (alteration in original)).

As in *Foreman* and *Balsley*, the evidence here is a far cry from that of *Huss, Langteau*, and *Gluff*. Unlike *Huss*—in which the Minnesota Supreme Court "determined that the testimony of the alleged victim of child abuse was insufficient because there was expert testimony that the victim had been exposed by the state to highly suggestive material"—there is no evidence here that any witness testimony was influenced by another party. *Foreman*, 680 N.W.2d at 539. Unlike *Langteau*—in which the supreme court "held that the uncorroborated testimony of the victim was insufficient to find the defendant guilty of aggravated robbery because the actions by the victim were questionable or unexplained"—the evidence in this case, as a whole, is reasonably consistent and corroborative about Maani's attack on the three victims with a machete in the apartment hallway. *Id.* And unlike *Gluff*—in which the supreme court "held that [an] uncorroborated identification of the defendant did not have probative value because the witness had seen the perpetrator for only a short time and there had been errors in the lineup process"—the facts before us present no analogous witness identification issues. *Id. Huss, Langteau*, and *Gluff* are therefore inapposite.

Based on our review of the trial evidence in this case, we conclude that the record teems with direct evidence in the form of percipient witness testimony based on personal knowledge and observation, all of which proves the facts underlying the jury's verdicts, without inference or presumption. *See Loveless*, 987 N.W.2d at 247. We therefore view the direct evidence in the light most favorable to the verdicts and apply our usual deference to the jury's credibility and evidence-weighing determinations. *See Segura*, 2024 WL

8

358029, at *6; *Loveless*, 987 N.W.2d at 246; *Olson*, 982 N.W.2d at 495. Below, we address each of Maani's specific sufficiency-of-the-evidence arguments in turn.

***The direct evidence was sufficient to permit the jurors to conclude that Maani assaulted the three victims with a dangerous weapon.***

Maani contends that the evidence is insufficient and contradictory about whether he used an actual knife designed as a dangerous weapon to assault the three victims. We are not persuaded.

"Whoever assaults another with a dangerous weapon" is guilty of second-degree assault. Minn. Stat. § 609.222, subd. 1. As noted above, assault is "an act done with intent to cause fear in another of immediate bodily harm or death[,]" or "the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10. Noting that "[t]he 'assault' element can be proved by any of three different means"—"taking any action with intent to cause fear in another of immediate bodily harm or death, intentionally inflicting bodily harm upon another, or attempting to inflict bodily harm upon another"— we have straightforwardly defined the elements of second-degree assault with a dangerous weapon as: "(1) assault; and (2) with a dangerous weapon." *State v. Infante*, 796 N.W.2d 349, 358 (Minn. App. 2011) (citing Minn. Stat. §§ 609.02, subd. 10, .222, subd. 1 (2008)) (other citation omitted), *rev. denied* (Minn. June 28, 2011).

As to the dangerous-weapon element, Minnesota law defines a "dangerous weapon" as including "any device designed as a weapon and capable of producing death or great bodily harm, . . . or other device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." Minn. Stat.

9

§ 609.02, subd. 6 (2020). And "'[g]reat bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm." *Id.*, subd. 8 (2020).

Viewing the direct trial evidence in the light most favorable to the verdicts, Maani ran towards the four women with a large machete-like knife between one foot and two feet long in his hand. Maani cut the victims by waving the weapon around, swinging it with "full arm force" like "he was trying to hurt" the women, "throwing [the weapon] back and forth, . . . and just slicing" them. Maani continued to do so even after victim 1 ran to the aid of victim 2, and even though the injuries he was inflicting on victims 1 and 2 were deep cuts that exposed subcutaneous tissue and caused blood to "gush[]" from victim 2's wound. Victims 1 and 2 used pieces of victim 3's shirt as makeshift tourniquets to stop their bleeding. Blood ended up smeared and splattered on the walls and carpet of the hallway leading to Maani's apartment. Victim 1 required help from police officers to walk down the stairs and exit the apartment building. Victims 1 and 2 were both transported via ambulance and treated at a hospital. Victim 1 received stitches and required "crutches for a while" after the incident, and victim 2 underwent surgery on her arm and later experienced scarring where Maani cut her. Victim 2's arm no longer functions "the way it used to." Victim 1's and victim 2's injuries were documented in photographic exhibits that the district court received into evidence.

This was sufficient evidence for the jury to reasonably conclude that, in assaulting the three victims, Maani used a device or instrumentality that, in the manner he used or

10

intended to use it, was calculated or likely to produce death or great bodily harm, including a high probability of death, serious permanent disfigurement, and both protracted loss and permanent impairment of the function of body parts. *See id.*, subds. 6, 8. The present facts are therefore readily distinguishable from those of *In re Welfare of P.W.F.*, which Maani urges is analogous, because *P.W.F.* involved "no claim that appellant used or intended to use the knife to produce death or great bodily harm," such that "appellant's knife could be a dangerous weapon only if it was designed as a weapon and was capable of producing death or great bodily harm." 625 N.W.2d 152, 154 (Minn. App. 2001).

It matters not that the state did not introduce the machete into evidence. Indeed, we have rejected a sufficiency-of-the-evidence challenge to a second-degree assault conviction even where "there was no weapon found, and the alleged victim testified he did not see a weapon." *Scott v. State*, 390 N.W.2d 889, 891–92 (Minn. App. 1986). We reasoned that "the jury could have reasonably concluded that [the defendant] used a knife" based on "the nature of the wound, the fact that [the victim] discovered he was bleeding shortly after [the defendant] hit him, the fact that [the defendant] chased and threatened [the victim], and the testimony of the five security officers that they saw a knife." *Id.* at 892; *see also State v. Seefeldt*, 292 N.W.2d 558, 562 (Minn. 1980) (rejecting a sufficiency-of-the-evidence challenge and affirming an assault-with-a-dangerous-weapon conviction where "the victim did not actually see the weapon used," but "testified that it was sharp and pointed like a knife and she believed that it was a knife[,]" and "[t]he pictures of the victim's minor wounds support the conclusion that a knife was used").

11

***The direct evidence was sufficient to permit the jurors to conclude that Maani assaulted victim 3, as charged in counts III and IV.***

Maani asserts that the evidence is insufficient to support the jury's guilty verdicts as to counts III and IV because victim 3 testified falsely and other evidence contradicted her testimony. This argument is likewise unavailing.

Notwithstanding any conflicting evidence about the cause and timing of the injury to victim 3's lower back, multiple witnesses testified that Maani both "attempt[ed] to inflict bodily harm upon" victim 3 and took "action with intent to cause fear in [victim 3] of immediate bodily harm or death," both of which are sufficient to prove the assault elements of counts III and IV. *Infante*, 796 N.W.2d at 358; *see also* Minn. Stat. § 609.02, subd. 10. Again, viewing the direct trial evidence in the light most favorable to the verdicts, Maani ran towards the four women—including victim 3—while holding a large machete-like knife that he swung with "full arm force" like "he was trying to hurt" the women. Victim 3 felt scared that she was going to die. Indeed, victim 3 testified that Maani actually cut her on her lower back as she and the other women ran through the hallway. In reviewing this direct evidence, we must assume that the jury believed the foregoing witness testimony and disbelieved any contrary evidence. *See Loveless*, 987 N.W.2d at 246–47. We must also defer to the jury's credibility determinations and forbear from reweighing the evidence. *See King*, 990 N.W.2d at 421; *Olson*, 982 N.W.2d at 495.

In sum, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, the jury could have reasonably concluded that the state

proved Maani's guilt as to all charges. Thus, we will not disturb the verdicts. *See Olson*,

982 N.W.2d at 495–96.

**Affirmed.**